"If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an *indispensable prerequisite* to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." *Gregg*, 428 U.S. at 190 (emphasis added).  Given the fact that defense counsel's performance resulted in the jury imposing a death sentence based on inaccurate "psychobabble," and the considerable mitigation evidence that could have been presented by an actual expert had counsel functioned properly, we find that "counsel's deficient performance render[ed] the result of the trial unreliable [and] the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  Accordingly, we find that the sentencing proceedings violated Skaggs's Sixth Amendment right to effective assistance of counsel.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of Skaggs's petition for a writ of habeas corpus based on the ineffective assistance of counsel received by Skaggs at the penalty phase of his trial.  Accordingly, we **REMAND** to the district court with instructions to issue a writ of habeas corpus vacating Skaggs's death sentence unless the Commonwealth conducts a new penalty proceeding within 180 days of remand.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0380P (6th Cir.)
File Name:  00a0380p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAVID LEROY SKAGGS,
  *Petitioner-Appellant,*

  *v.*                                                    No. 98-6249

PHIL PARKER, Warden,
  *Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 96-00008—Joseph H. McKinley, Jr., District Judge.

Argued:  November 3, 1999

Decided and Filed:  October 31, 2000

Before:  MERRITT, NELSON, and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:**   Rodney McDaniel, DEPARTMENT OF PUBLIC ADVOCACY, Frankfort, Kentucky, for Appellant. David A. Smith, ASSISTANT ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Rodney McDaniel, Thomas M. Ransdell, DEPARTMENT OF PUBLIC ADVOCACY, Frankfort, Kentucky, for Appellant. David A. Smith, Ian G. Sonego, ASSISTANT ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. Petitioner-Appellant David Leroy Skaggs was convicted by a Kentucky jury of two counts of capital murder, one count of first degree robbery, and one count of first degree burglary. Skaggs was sentenced to death on the murder convictions, twenty years each on the robbery convictions, and twenty years on the burglary conviction. Skaggs appealed, and the Kentucky Supreme Court granted discretionary review and affirmed Skaggs's conviction and sentence. *See Skaggs v. Commonwealth*, 694 S.W.2d 672 (Ky. 1985). The United States District Court for the Western District of Kentucky denied Skaggs's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, *see Skaggs v. Parker*, 27 F. Supp.2d 952 (W.D. Ky. 1998), and then issued a certificate of probable cause pursuant to 28 U.S.C. § 2253. On appeal to this Court, Skaggs raises numerous assignments of error, only one of which has merit and warrants our discussion: whether Skaggs received ineffective assistance of counsel in violation of his Sixth Amendment rights. For the reasons that follow, we conclude that Skaggs's trial counsel provided ineffective assistance of counsel at the penalty phase of the trial; accordingly, we REVERSE the district court's denial of Skaggs's petition for a writ of habeas corpus.

## I. BACKGROUND

On May 6, 1981, Herman and Mae Matthews were shot and killed in their home near Glasgow, Kentucky. The ensuing investigation led police to Skaggs in Columbus, Indiana. Several days later, law enforcement officials transported Skaggs to Kentucky where he was arraigned. During this time, Skaggs made two confessions and other inculpatory statements. Skaggs also led police to the murder weapon and Mae Matthews's purse.

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Bresler misrepresented himself as a licensed clinical and forensic psychologist; his presentation to the jury was fraudulent and resulted in the jury making a determination regarding the appropriate sentence for Skaggs without the aid of critical mitigating information. As Dr. Engum stated:

> Mr. Bresler determined that Mr. Skaggs was performing within the average range of intellectual functioning, a finding that is definitely belied by [Skaggs's] most recent intelligence testing. Mr. Bresler was also completely negligent and totally incompetent in terms of evaluating Mr. Skaggs's overall neuropsychological status. While this examiner cannot definitely diagnose Mr. Skaggs as suffering from an underlying organic brain syndrome, a simple quantitative analysis of his neuropsychological test results reveals significant compromise in brain-behavior relationships.
>
> . . . .
>
> By ineffectively evaluating the client, by arriving at clearly erroneous diagnostic impressions, by positing criminal insanity when none existed, by failing to identify Mr. Skaggs's low borderline intellectual functioning, by failing to identify Mr. Skaggs's neuropsychological deficits, and by producing a report which contained what may be charitably termed psychobabble, . . . Mr. Skaggs's psychological status was misrepresented and the salient features were omitted from the jury's purview.

Furthermore, defense counsel failed to prepare or present any other meaningful mitigation evidence that might have compensated for their use of Bresler, or aided the jury in understanding Skaggs's actual mental status.

. . . .

In addition, there are strong paranoid features which suggest that this client has lived under the fear of attack and humiliation. There appears to be a constant sense of threat of being attacked. . . . There is also an associated constant effort to define what is the appropriate behavior in a particular situation.

. . . .

The extreme elevation of the Schizophrenia Scale further bolsters the assumption that the clinical profile accurately reflects Mr. Skaggs's current level of functioning . . . . The elevation on the Schizophrenia Scale appears to reflect an individual who is confused, withdrawn, suspicious, and socially isolated. Such an elevation is often associated with active psychotic thought processes, extremely poor judgment, and significant impairment in reality testing. It is likely that this individual experiences unusual perceptual events, possible hallucinatory activity, and unusual ideas that may include magical thinking or delusional beliefs.

(citations omitted). Based on this information, it is reasonable to think that the jury could have found the statutory mitigating circumstance of Skaggs's impaired ability to "appreciate the criminality of his conduct the requirements of law . . . as a result of mental illness or retardation . . . ." *See* KY. REV. STAT. ANN. § 532.025(b)(7).

In sum, we believe that there is a reasonable probability that the jury would have weighed the mitigating and aggravating factors differently had counsel performed adequately.[5] *See Strickland*, 466 U.S. at 694 ("The defendant must show that

---

[5]Although not dispositive of our decision, we note that the first jury to sentence Skaggs, which did not hear the testimony of Bresler for purposes of sentencing, expressed its hesitation to give Skaggs the death penalty and, in the end, could not agree on an appropriate sentence.

Prior to trial, Skaggs informed the Barren County Circuit Court that he intended to introduce evidence of his mental illness. The court appointed two psychiatrists to evaluate Skaggs's mental condition. One psychiatrist, Dr. Lawrence P. Green, was to evaluate Skaggs and provide both the Commonwealth and the defense with a copy of his report. The other psychiatrist, Dr. William J. Kernohan, was appointed as a "defense psychiatrist" and was to provide his report to only Skaggs's counsel. Dr. Kernohan refused to evaluate Skaggs, resulting in a court order for Skaggs to be evaluated by Dr. Pran Ravani of the Kentucky Correctional Psychiatric Center ("KCPC"). Skaggs objected to the court order and requested that the court appoint an independent psychiatrist for his defense. Skaggs's attorneys selected Elya Bresler, who claimed to be a licensed clinical and forensic psychologist, and the court approved payment of $1,000 for Bresler's services. Bresler evaluated Skaggs in preparation for Skaggs's insanity defense at trial.

The guilt phase of the trial commenced on February 23, 1982. At trial, Bresler testified that Skaggs suffered from a "depressive disorder" and "paranoid personality disorder," both of which would have affected Skaggs's ability to understand the criminality of his actions and to distinguish right from wrong. However, Bresler's testimony was rambling, confusing, and, at times, incoherent to the point of being comical. The Commonwealth presented the testimony of Dr. Ravani, who testified that Skaggs had a history of alcohol abuse and displayed a "schizophrenic trend" but could appreciate the difference between right and wrong. The jury rejected Skaggs's insanity defense and returned verdicts of guilty on all charges. The court proceeded to the penalty phase of the trial, but defense counsel chose not to call Bresler because his performance was so poor during the guilt phase. The jury could not agree on an appropriate penalty for the two murder convictions, resulting in a mistrial.

On June 23, 1982, four months later, the court convened a second penalty phase hearing before a new jury. The Commonwealth reintroduced much of the same evidence it

had introduced at the guilt phase of the trial, and the testimony of those witnesses was essentially the same. The Commonwealth also introduced, over defense objections, Skaggs's prior criminal record, including convictions of non-assaultive offenses. Defense counsel called Skaggs's father, Roland Skaggs, who testified that his son was born in an "insane asylum," was raised by his grandmother, and started getting into criminal trouble only after leaving home. Defense counsel also decided to recall Bresler, despite his previous poor performance. Bresler testified that Skaggs suffered from a depressive disorder and a paranoid personality disorder which would have impaired his capacity to appreciate the nature of his conduct and to conform his conduct to the requirements of the law. On rebuttal, the Commonwealth called Dr. Ravani, who again testified that despite Skaggs's "schizophrenic trend," he had the substantial capacity to resist an impulse to violate the law.

At the conclusion of the penalty phase, the court instructed the jury on two aggravating circumstances with regard to the death of Herman Matthews: (1) Skaggs was engaged in committing a first-degree robbery at the time Herman Matthews was killed; and (2) Skaggs's act of killing Herman Matthews was intentional and also resulted in the death of Mae Matthews. The court also instructed the jury on the aggravating circumstances with regard to the death of Mae Matthews: Skaggs was engaged in committing a first-degree robbery and first-degree burglary at the time Mae Matthews was killed. Finally, the court instructed the jury to consider the mitigating factors of Skaggs's emotional disturbance and whether Skaggs could appreciate the criminality of his conduct or conform his conduct to the requirements of the law in light of his mental disease or defect.[1]  The jury

---

[1] As it existed at the time, the Kentucky statute regarding a jury's consideration of mitigating evidence provided:

(2) In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating

---

§§ 532.130, 532.140.[4]  Dr. Engum's neuropsychological assessment of Skaggs revealed:

Mr. Skaggs suffers from significant compromise in almost all areas of cognitive function. . . .  In fact, considering the four most sensitive indicators of brain dysfunction in terms of level of performance, . . . Mr. Skaggs's scores were clearly in the brain damaged range in each instance. . . .  Accordingly, the results of comprehensive neuropsychological assessment clearly reflect a pattern of results consistent with some form of organic brain syndrome.

. . . .

The primary elevations of the clinical profile reflect an individual who may be in a borderline psychotic condition with severe disturbances of thought, mood, and behavior. Such individuals typically harbor intense feelings of insecurity and inferiority. They lack self-confidence and self-esteem and feel guilty about perceived failures.

---

[4] Current Kentucky law bans the execution of mentally retarded persons. *See* KY. REV. STAT. ANN. § 532.140. Under this statute, which became effective July 1, 1990 and does not apply to Skaggs, the court must determine, prior to trial, whether a defendant is mentally retarded. To this end, the court must evaluate a number of factors, including whether the defendant's I.Q. is 70 or below. *See* KY. REV. STAT. ANN. §§ 532.130, 532.135; *see also* TENN. CODE ANN. § 39-13-203 (1999) (barring the imposition of a death sentence on a mentally retarded person). To be sure, imposing a death sentence on a person who is considered to be mentally retarded and who has committed a capital crime has not been found to be a *per se* violation of the Eighth Amendment, *see Penry*, 492 U.S. at 335; nonetheless, mental retardation frequently is considered a mitigating factor, *see* KY. REV. ST. ANN. § 532.025; *cf.* OHIO REV. CODE ANN. § 2929.04(B)(3) (Banks-Baldwin 2000) (listing, as a statutory mitigating factor, "whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law").

marginally competent expert on crucial evidence prejudiced Skaggs at the penalty phase of the trial. Skaggs's one chance at mitigation — and avoidance of a death sentence — was his borderline mental retardation and other clinical psychological conditions, which counsel did not present to the jury.

Dr. Engum's report stated:

[W]ith regard to the most significant issues; namely intelligence, the presence or absence of indicia of organic brain damage, and the presence or absence of a major psychosis (schizophrenia, affective disorder, or organic brain syndrome with psychosis), Mr. Bresler's findings were erroneous, improper, not supported by the data, and arguably misrepresentative of the client.

Dr. Engum further opined that "Bresler's obvious incompetence so detracted from the proceedings that the jury was either not allowed to hear or never had a chance to consider the more subtle aspects of Mr. Skaggs's psychological development, personality status, present level of cognitive functioning, emotional status, or potential for long term adjustment in a penal facility . . . ." In other words, the jury that sentenced Skaggs to death did not have accurate information about the mental status of the person it was sentencing. If counsel had performed adequately, the jury would have had significant mitigating evidence to consider.

Dr. Engum and Dr. Yont both indicated that Skaggs is mildly mentally retarded because Skaggs scored 64 on one I.Q. test, which is below the current Kentucky standard for eligibility for the death penalty. *See* KY. REV. STAT. ANN.

recommended that Skaggs be sentenced to death, and the court entered a final sentence of death on July 13, 1982.

Skaggs filed several motions for a new trial on the basis of newly discovered evidence, all of which were denied. His first motion was based upon the discovery by appellate counsel that Bresler had completely falsified his credentials, was not a licensed clinical or forensic psychologist, and had no academic degrees or training as a psychologist whatsoever—in fact, his post-secondary education consisted of two years of college as an English major. Skaggs filed a second motion for a new trial, offering the additional evaluations of two psychiatric experts who examined Skaggs in preparation for his federal habeas petition. Dr. Charles Yont, a certified psychologist, stated that Skaggs was mildly retarded and functioned at the level of a twelve- or thirteen-year-old. Dr. Eric Engum, a clinical neuropsychologist, determined that Skaggs's intelligence quotient ("I.Q.") of 64 indicated that Skaggs was borderline mentally retarded and that Bresler's testimony was "so far below the standard of care as to totally misrepresent Mr. Skaggs to the jury . . . ."

The trial court acknowledged Bresler's lack of credentials but overruled Skaggs's motions. Skaggs appealed to the Kentucky Court of Appeals, which consolidated the appeals

---

circumstances otherwise authorized by law and any of the following statutory . . . mitigating circumstances[:]

(b) Mitigating Circumstances:

7. At the time of the capital offense, the capacity of the defendant to appreciate the criminality of his conduct [or to conform the conduct] to the requirements of law was impaired as a result of mental illness or retardation or intoxication even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law is insufficient to constitute a defense to the crime . . . .

KY. REV. STAT. ANN. § 532.025 (Banks-Baldwin 1982).

from both orders and affirmed the judgments of the trial court. The Kentucky Supreme Court granted discretionary review as to all issues raised in the appellate court and unanimously affirmed Skaggs's conviction and sentence. The United States Supreme Court denied certiorari.

On January 19, 1996, Skaggs filed a federal habeas petition pursuant to 28 U.S.C. § 2254, raising numerous assignments of error. The district court held an evidentiary hearing limited to Skaggs's claim of ineffective assistance of counsel. On July 22, 1998, the district court denied Skaggs's petition for habeas relief, granted him *in forma pauperis* status for appeal, and issued a certificate of probable cause.

On appeal, Skaggs raises twenty-seven assignments of error, including ineffective assistance of counsel at both the guilt and sentencing phases of his trial. Although we agree with the district court that Skaggs's challenges to the guilt phase of his trial do not satisfy the standard for grant of a habeas petition, we conclude that Skaggs received ineffective assistance of counsel during the penalty phase of his trial, and, therefore, grant his habeas petition based on that issue.

## II. ANALYSIS

### A.  Standard of Review

Skaggs filed his federal petition for writ of habeas corpus in January 1996, prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became effective on April 24, 1996. Accordingly, pre-AEDPA law governs Skaggs's entitlement to habeas relief. *See Lindh v. Murphy,* 521 U.S. 320, 327 (1997). Nonetheless, the certificate of appealability ("COA") requirements set forth in 28 U.S.C. § 2253(c) *after* the enactment of AEDPA apply to Skaggs's appeal of the district court's denial of his habeas petition, which was initiated after AEDPA's effective date. *See Slack v. McDaniel*, 120 S. Ct. 1595, 1602 (2000) (holding that when a habeas petitioner seeks to initiate an appeal of the dismissal of his petition after AEDPA's effective date, the right to appeal is governed by the COA requirements found in

investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them.

*Ake*, 470 U.S. at 80-81 (citations omitted). We have interpreted *Ake* to recognize that in addition to the right to a psychiatric expert at the guilt phase, an indigent defendant is constitutionally entitled to the psychiatric or psychological assistance during the sentencing phase if "1) the defendant's sanity was a significant issue during the trial, or 2) defendant is on trial for his life and the state first presents psychiatric evidence of future dangerousness." *United States v. Osoba*, 213 F.3d 913, 917 (6th Cir. 2000) (citing *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc)).

The case before us is not one of a mere disagreement between experts, or a case in which the expert for the petitioner did not testify as favorably as the petitioner had hoped — both circumstances in which the granting of a habeas petition would be inappropriate. Nor do we rely on the suggestion from *Ake*, not explicitly adopted by this Court, that the petitioner is entitled to a competent expert in his defense. *Compare Vickers v. Stewart*, 144 F.3d 613, 614 (9th Cir. 1999) (suggesting that a reviewing court could scrutinize the state's actions regarding providing effective assistance of a defense expert), *with Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998) ("reject[ing] the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness").[3] In this case, there is no need to go so far as to hold that Skaggs was entitled to a competent defense expert because, here, the prejudice to Skaggs resulted from his own counsel's failure to assert effectively his rights at sentencing, including the presentation of mitigating evidence. More specifically, counsel's failure to present an even

---

[3] We note, however, Judge Murnaghan's dissent in *Ramdass v. Angelone*, 187 F.3d 396, 411 n.1 (4th Cir. 1999), in which he chastised the majority's opinion, noting that *Ake* clearly "requires more than just a warm body with a prefix attached to his name . . . ."

The Supreme Court has considered the pivotal role that psychiatry has come to play in criminal proceedings, acknowledging the importance and power of expert testimony:

[W]hen the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

. . . .

By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their

§ 2253(c), regardless of whether the habeas petition was filed in the district court before AEDPA's effective date).

We review the district court's denial of a petition for writ of habeas corpus *de novo*. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). Although this standard applies to questions of federal constitutional law, findings of fact made by the district court are reviewed for clear error. *See id.* We may issue a writ of habeas corpus if the state court proceeding was fundamentally unfair as a result of a violation of the Constitution, laws, or treaties of the United States. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Findings of fact and determinations regarding the credibility of witnesses made by the state courts are presumed to be correct. *See* 28 U.S.C. § 2254(d) (1994); *Thompson v. Keohane*, 516 U.S. 99, 108-13 (1995). This presumption of correctness, however, applies only to basic, primary facts, and not to mixed questions of law and fact, which are reviewed *de novo*. *See McQueen*, 99 F.3d at 1310.

### B. Certificate of Appealability

Here, the district court issued a certificate of probable cause, stating only that "[t]he Court grants Petitioner leave to appeal . . . by issuing a certificate of probable cause pursuant to 28 U.S.C. § 2253 (1994)." As previously stated, however, we must apply the COA requirements found in the post-AEDPA version of § 2253 because Skaggs filed his notice of appeal after the effective date of AEDPA. *See Slack*, 120 S. Ct. at 1602. Pursuant to post-AEDPA § 2253(c), a COA may issue only upon a "substantial showing of the denial of a constitutional right." Further, § 2253(c) requires the COA to "indicate which specific issue or issues satisfy the showing required." In the present case, the district court did not specify the particular issues or issue that satisfy the § 2253(c) standard, but instead issued a blanket certificate of probable cause.

We decline to address the question of whether a COA should have, in fact, issued for each and every ground raised by Skaggs in his habeas petition. As we stated at the outset,

we find that only one issue raised by Skaggs warrants our discussion:    whether Skaggs was denied his Sixth Amendment right to effective assistance of counsel. With respect to this issue, we conclude that the requirements set forth in post-AEDPA § 2253(c) have been met, because Skaggs's Sixth Amendment claims make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); *see Mackey v. Dutton,* 217 F.3d 399, 406-07 (6th Cir. 2000) (holding that when a district court grants a certificate of probable cause instead of a COA, a reviewing court may consider an issue raised so long as the issue satisfies the statutory standards set forth in § 2253(c)). Accordingly, Skaggs's claim of ineffective assistance of counsel is properly before this court.

## C.  Ineffective Assistance of Counsel

The familiar standard by which a Sixth Amendment ineffective assistance of counsel claim is reviewed is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. In other words, in order to prevail on a claim of ineffective representation, the petitioner must establish that, in light of all the circumstances, trial counsel's performance fell below an objective standard of reasonableness and that the resulting prejudice deprived him of a fair trial. *See Jones v. United States*, 161 F.3d 397, 400 (6th Cir. 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). Although we review the district court's findings of fact pertinent to this question for clear error, the performance and prejudice components of the *Strickland* test are considered

The Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial. The Constitution also requires defense counsel to reasonably investigate a defendant's background and present it to the jury. Failure to investigate or present mitigating evidence at sentencing may constitute ineffective assistance of counsel.

(citations omitted). Furthermore, although Kentucky law provides a list of statutory mitigating factors, *see* KY. REV. ST. ANN. § 532.025, a criminal defendant is not limited to presenting evidence of only these statutory circumstances. *See Penry*, 492 U.S. at 317 ("[T]he Eighth and Fourteenth Amendments require that the sentencer 'not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"(quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978))).

Considering the foregoing, we now must evaluate whether defense counsel's failures prejudiced Skaggs in light of the purpose of a capital sentencing hearing. At the second penalty hearing, the trial court instructed the jury on two statutory mitigating factors:    (1) extreme emotional disturbance; and (2) whether Skaggs's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired because of mental disease or defect. The only mitigating evidence relating to Skaggs's mental state presented by defense counsel was the testimony of Bresler—a fraudulent "expert" whom counsel had not investigated but chose to use despite the mockery he created through his testimony at the guilt phase. Counsel's deficient performance at sentencing resulted in the presentation of essentially no mitigating evidence at all, especially on the one topic which may have convinced the jury that a death sentence was not justified: Skaggs's mild mental retardation and his diminished mental capacity.

Cir. 1996) ("The question for reviewing courts is whether counsel's errors have likely undermined the reliability of, and confidence in, the result."). As the Supreme Court explained in *Strickland*, "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 696. The Court recently emphasized that a petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability that the result would have been different. *See Williams v. Taylor*, 120 S. Ct. 1495, 1519 (2000).

In *Gregg v. Georgia*, 428 U.S. 153 (1976), which reinstated the death penalty, the Supreme Court discussed the importance of a case-by-case determination at the sentencing hearing. "We have long recognized that '[f]or the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender.'" *Id*. at 189 (quoting *Pennsylvania ex. rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)). Since *Gregg*, the Court has reaffirmed that sentencing determinations must be made based upon an examination of the particular characteristics of the defendant. *See Penry v. Lynaugh*, 492 U.S. 302, 317 (1989) ("[T]he Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty."); *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (requiring that once the defendant is put in the category of persons eligible for the death penalty, the jury must make an individualized determination "on the basis of the character of the individual and the circumstances of the crime").

We have held that, at sentencing, a defendant must be afforded the opportunity to put forth relevant, mitigating evidence. *See Austin*, 126 F.3d at 848; *Glenn*, 71 F.3d at 1206-08. In *Austin*, we noted:

mixed questions of law and fact, and are thus subject to *de novo* review. *See Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir. 1992) (citing *Strickland*, 466 U.S. at 698).

We believe that Skaggs cannot meet the *Strickland* standard with respect to counsel's performance at the guilt phase of the trial; however, we find that counsel's very significant errors at the penalty phase of the trial — particularly the failure to investigate and present meaningful mitigating evidence, and their decision to use an incompetent and fraudulent "psychologist" as the central mitigation witness — rendered counsel constitutionally ineffective, such that our confidence in the outcome of the penalty phase of Skaggs's trial has been nullified.

### 1. Guilt Phase

Before trial, Skaggs's counsel informed the court that he wished to raise a mental illness defense at trial. Because Skaggs was an indigent defendant with appointed counsel, he had the right to a psychiatric expert under *Ake v. Oklahoma*.[2]

---

[2] 470 U.S. 68 (1985). In addition to his claims of ineffective assistance of counsel, Skaggs argues that because Bresler was a fraud, he was denied access to a competent psychiatrist to assist in his defense and that such a denial violated his due process rights. In *Ake*, the Supreme Court held "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at the trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83.

Upon careful examination of the record, the parties' briefs, and information adduced at oral argument, we find nothing to indicate that the Commonwealth denied Skaggs *access* to a competent psychiatric evaluation. The trial court granted Skaggs's motion for appointment of an independent psychiatrist to evaluate Skaggs and approved payment for his or her services. It was defense counsel who chose Bresler, and despite the fact that defense counsel may have chosen someone incompetent, our concern under *Ake* is with the actions of the Commonwealth and whether Skaggs had "access to a competent psychiatrist" in preparation of his defense. We find that he did. The fact that defense counsel failed to engage a competent psychiatrist to testify on Skaggs's behalf, however, is significant to Skaggs's ineffective assistance of counsel claim.

The court appointed two psychiatric experts to assist Skaggs, but both experts refused to serve. The court then ordered the KCPC to evaluate Skaggs, but Skaggs's counsel instead requested funds for an independent expert. Upon approval by the court, counsel thereafter secured the services of Bresler. During the guilt phase of Skaggs's trial, Bresler falsely testified that he was a licensed clinical and forensic psychologist. He also falsely claimed to have a Bachelor's degree, a Master's degree, and Doctorate degrees from San Diego State University and the University of California, and to be licensed in numerous states, including Kentucky.

Skaggs asserts that trial counsel Donna Boyce and Joe Kirwin were ineffective during the guilt phase of his trial by failing to investigate Bresler's credentials or background and presenting Bresler as an expert defense witness. At the district court's evidentiary hearing conducted in connection with Skaggs's ineffective assistance of counsel claim, Boyce testified that she and co-counsel Kirwin, having objected to Skaggs being examined by a state psychiatrist, had a difficult time finding a psychologist who could perform a timely, independent psychiatric evaluation of Skaggs. During the hearing, Boyce was asked to tell the court what investigation she conducted into Bresler's background and qualifications before utilizing him as a witness; she responded, "Absolutely none." Boyce testified, however, that she had used Bresler in another trial conducted in 1979, three years before Skaggs's trial. Boyce testified, "He did fine . . . . Basically we were presenting an insanity. . . defense, and he did okay. I mean he was okay. He wasn't great. . . . I mean he was the person I went to when I couldn't find anybody else, but he was okay." Boyce also explained that two attorneys she knew from the Kentucky Department of Public Advocacy ("KDPA")—Assistant Public Advocate Bill Radigan and General Counsel Vince Aprile—had recommended Bresler to her. Finally, Boyce recalled that at the time she hired Bresler for the 1979 trial, he had been working as a psychologist in Eastern Kentucky for a "comp-care type facility." Kirwin also testified at the evidentiary hearing that he had conducted no investigation into Bresler's qualifications. Kirwin stated,

Commonwealth: And I believe the Secretary of the Interior, you said, similarly, Mr. Watts?

Despite acknowledging that Bresler was not a competent witness and, in fact, made a mockery of the first trial, defense counsel nevertheless called him to testify at the second penalty phase, primarily because counsel waited until the eleventh hour to prepare for the penalty phase and to line up a psychiatric expert to testify on Skaggs's behalf. Counsel's decision to call Bresler at the retrial of the penalty phase, despite their belief that Bresler's testimony could realistically be more harmful than helpful, simply because counsel believed it would not be worth their time to request additional money from the court, cannot be deemed to have been a reasonable exercise of professional judgment. Because defense counsel failed to introduce other competent mitigating evidence, they essentially failed to put on any mitigating evidence at all. Thus, we hold that counsel's decision to present Bresler's testimony as crucial mitigating evidence at the penalty phase of the trial, having had the advantage of witnessing Bresler's previous bizarre performance and, more importantly, counsel's complete failure to present other mitigating evidence on Skaggs's behalf, fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687.

### b. Prejudice

To establish the prejudice prong of an ineffective assistance claim, Skaggs "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) ("[T]he 'prejudice' component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."); *West v. Seabold*, 73 F.3d 81, 84 (6th

summons for another witness, another expert witness. And our only reason could be that we didn't think that our expert turned out to be very competent on the stand.

So we decided we would ask the judge for more money so Elliott [sic] Bresler could come back, thinking that probably the judge would deny that. But he granted it, and so we ended up recalling [Bresler] for the retrial.

Upon Bresler's cross-examination during the penalty phase, the prosecution questioned him on some of the more peculiar aspects of his earlier testimony:

Commonwealth: The last time we talked, I was interested that a great number of famous people you thought were psychotic, great – great people like Einstein.

Bresler: I never said that Einstein was psychotic.

Commonwealth: You remember what you told me about that?

Bresler: I said he had some eccentricities. I said he had some eccentricities. First of all, I would never say anyone was psychotic, unless I had examined them. I do not make value judgments.

Commonwealth: You, obviously, hadn't had an opportunity to examine Dr. Einstein?

Bresler: I knew Einstein personally, but I never examined him, and he had some eccentricities.

however, that he had been familiar with Bresler at the time he and Boyce decided to use Bresler as an expert witness. Kirwin testified that he knew that the KDPA had a prior relationship with Bresler and had used him as a psychiatric expert and that he himself had met Bresler while working on a previous capital case in which Bresler had testified as an expert.

Under *Strickland*, the objective standard of reasonableness is a highly deferential standard and includes a "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. With respect to counsel's failure to investigate:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id.* at 690-91.

Boyce and Kirwin located Bresler and retained his services much the same way many trial attorneys obtain an expert: through recommendations from colleagues and general familiarity within the legal community. Given the magnitude of what was at stake, and the centrality of Skaggs's mental state to a legitimate defense, counsel should have taken more time and given more thought to their expert witness. Nonetheless, considering counsel's general familiarity with Bresler as an expert witness and Boyce's utilization of his services in the past, we hold that counsel's failure to conduct a full-blown investigation into Bresler's academic history, or to verify his credentials any further than had been done, did not fall below an objective standard of reasonableness under *Strickland*. Defense counsel's decision to hire Bresler for the guilt phase of the trial may not have been the best possible

choice for Skaggs's defense, but in light of all the circumstances, we cannot say that the decision was an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

### 2. Penalty Phase

#### a. Cause

Skaggs also argues in his habeas petition that he received ineffective assistance of counsel at the penalty phase based on counsel's failure to present mitigating evidence, in particular, counsel's failure to present the jury with a realistic view of Skaggs's mental status. Although we find that it was not unreasonable for counsel to have used Bresler during the guilt phase of the trial, counsel's decision to use Bresler again at the penalty phase presents us with an entirely different question.

After having observed Bresler's bizarre and eccentric testimony, did counsel have a duty to find a different psychiatric expert for the retrial of the penalty phase? Put differently, did counsel have a responsibility to present meaningful mitigating evidence? We think that they did. We find that Skaggs's counsel acted below an objective standard of reasonableness at sentencing, essentially providing no legitimate mitigating evidence on Skaggs's behalf, and that this failure severely undermines our confidence in the just outcome of this proceeding.

Failure to present mitigating evidence at sentencing constitutes ineffective assistance of counsel. *See Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (holding that defense counsel's failure to investigate or present any mitigating evidence because counsel believed that it would be of no benefit constituted ineffective assistance of counsel when several witnesses were available and willing to testify on defendant's behalf, as the failure to present mitigating evidence undermined the adversarial process and rendered the death sentence unreliable); *Glenn v. Tate*, 71 F.3d 1204,

1206-08 (6th Cir. 1995) (holding that counsel provided ineffective assistance when mitigating information was not presented to the jury at sentencing because counsel made virtually no attempt to prepare for sentencing phase). In *Austin*, we recognized that the failure to present mitigating evidence when it was available could not be considered a strategic decision, but rather, an "abdication of advocacy." 126 F.3d at 849. Such an abdication occurred in the present case.

At the evidentiary hearing, Boyce was questioned about Bresler's testimony during the guilt phase of the trial and her initial decision not to use Bresler during the penalty phase, stating:

A:  [H]e was awful. He was incoherent. He was talking about things that didn't make sense. You couldn't stop him. You couldn't reel him back in. People in the audience were laughing at him.

So Joe [Kirwin] and I talked afterwards. Our initial intent had been to recall him at the penalty phase. We discussed it and decided we would be in better shape not calling him than we would be if we called him. So we did not recall him at the penalty phase.

Boyce then was questioned about why she had changed her mind and decided to call Bresler at the second penalty hearing:

Q:  Between the mistrial and the retrial of the penalty phase, what efforts or discussions were had as far as getting an expert witness in the [second] penalty phase?

A:  Joe and I talked about what to do, again about Elliott [sic] Bresler, who had been such a bad witness. Ultimately we decided since we had such a difficult time getting any money or the right to call or have David [Skaggs] evaluated by our own expert, that it was unlikely that Judge Waldon would give a