RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0134P (6th Cir.)
File Name: 03a0134p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

TONY M. POWELL,
    *Petitioner-Appellant,*

    *v.*

No. 98-4053

TERRY COLLINS, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 94-00656—Herman J. Weber, District Judge.

Argued: November 28, 2000

Decided and Filed: May 7, 2003

Before: DAUGHTREY, CLAY, and GILMAN, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Mark A. Vander Laan, DINSMORE & SHOHL,
Cincinnati, Ohio, for Appellant. Charles L. Wille,
ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL
CRIMES SECTION, Columbus, Ohio, for Appellee.
**ON BRIEF:** Mark A. Vander Laan, DINSMORE &
SHOHL, Cincinnati, Ohio, James V. Schuster, TAFT,
STETTINIUS & HOLLISTER, Cincinnati, Ohio, William S.

Lazarow, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio,
for Appellant. Charles L. Wille, ATTORNEY GENERAL'S
OFFICE OF OHIO, CAPITAL CRIMES SECTION,
Columbus, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which
GILMAN, J., joined. DAUGHTREY, J. (pp. 41-46),
delivered a separate opinion concurring in part and dissenting
in part.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Petitioner, Tony M. Powell, appeals
from the district court's order denying his motion for
reconsideration of the court's judgment denying Petitioner's
motion for an evidentiary hearing and discovery as well as his
petition for a writ of habeas corpus brought pursuant to 28
U.S.C. § 2254. Petitioner was convicted on two counts of
aggravated murder, among other counts, and was sentenced
to death. On both direct appeal and collateral review, the
Ohio courts affirmed Petitioner's conviction. The United
States District Court for the Southern District of Ohio denied
his petition for a writ of habeas corpus, and thereafter issued
a certificate of probable cause pursuant to 28 U.S.C. § 2253.

On appeal, Petitioner raises numerous assignments of error,
including whether he was denied due process by being
deprived of the expert psychological assistance recognized by
the United States Supreme Court in *Ake v. Oklahoma*, 470
U.S. 68 (1985), and whether he was deprived of the effective
assistance of counsel at the guilt and sentencing phases of his
trial. Although we agree with the district court that
Petitioner's challenges to the guilt phase of his trial do not
merit habeas relief, we conclude that Petitioner was denied
his right to psychological assistance and effective assistance
of counsel during the sentencing phase of his trial, and that
the state trial court improperly denied Petitioner's motion for
a continuance prior to the sentencing phase. Accordingly, we

**REVERSE** the district court's denial of the writ on these bases, and we **REMAND** to the district court with instructions to issue a writ of habeas corpus vacating Powell's death sentence unless the State of Ohio conducts a new penalty proceeding within 180 days of remand.

## I. BACKGROUND

On July 29, 1986, Petitioner was arrested in Cincinnati, Ohio, in connection with the death of seven-year-old Trina Dukes. The Ohio Supreme Court explained the pertinent facts leading to Petitioner's aggravated murder conviction as follows:

On July 29, 1986, Trina Dukes, age seven, was playing with her cousin Marcorsha Dukes and another child in front of the Dukes family's home in Cincinnati. Appellant, Tony M. Powell, approached the three children and asked Trina and Marcorsha if they knew how to ride a bike. Trina replied, "Yes." The three children followed Powell around the corner to 214 West Liberty Street.

Powell asked Trina to come upstairs with him and told the other two to leave. He led Trina to the fourth floor and told her to take off her clothes. (He later admitted to police that he had intended to "fuck" Trina.) Trina cried and said she wanted to go home.

Meanwhile, Marcorsha had told her grandfather, Robert Dukes (known as "Big Duke" to his grandchildren), where Trina had gone. Dukes and Marcorsha's brother Marvin went to investigate. Marcorsha led them to the building where Powell had taken Trina.

Dukes went behind the building and called Trina's name. Trina called back, "Big Duke, Big Duke." Powell grabbed her mouth to quiet her cries. Dukes entered the building and ran upstairs, followed by Marchorsha and Marvin. Hearing their approach, Powell picked up Trina.

As he did, she defecated on him. He threw her out the window.

When Dukes and the children reached the third-floor landing, they heard a crash. Then Powell, wearing no shirt, ran downstairs past them, saying that someone had been beating him up. The Dukeses proceeded to the fourth floor. Looking out a window, they saw Trina's nude body lying next to some garbage cans. The Dukeses summoned the police and paramedics. Although Trina was still breathing when the paramedics arrived, she was dead by the next day.

Meanwhile, Powell was leaving the building. On his way out, he encountered Shirley Lee, who lived there. He pushed her aside and mumbled, "I did what I intended to do to that bitch." Then he ran down the street. Police later found Powell hiding behind the refrigerator in his mother's apartment.

Deputy Coroner Ross Zumwalt performed an autopsy on Trina's body. He found numerous petechia, or small hemorrhages, on Trina's face. He also found bruises and abrasions on the inner surface of the lips and six small scratches on the neck. According Zumwalt, these injuries indicated that Trina had been partially asphyxiated by a hand clamped over her mouth.

Zumwalt also found a 5.7-inch laceration along Trina's chest and numerous other lacerations, bruises, and abrasions on Trina's head and body, consistent with a fall. Zumwalt concluded that Trina's death resulted from "blunt impact to the head, [and] the trunk, with multiple injuries and smothering."

*State v. Powell*, 552 N.E.2d 191, 193 (Ohio 1990) (alteration in original). Petitioner agrees with the recitation of facts found in this opinion and does not deny on appeal that he committed the acts which led to Trina's death.

### Trial Proceedings

On September 5, 1986, a Hamilton County, Ohio, grand jury returned a five-count indictment charging Petitioner with the following violations of the Ohio Revised Code: aggravated murder during a kidnapping in violation of § 2903.01 with a kidnapping specification (Count One); aggravated murder during a rape in violation of § 2903.02 with a rape specification (Count Two); kidnapping by restraining the victim in violation of § 2905.01 (Count Three); kidnapping by removing the victim from the place where she was found in violation of § 2905.01 (Count Four); and rape in violation of § 2907.02 (Count Five). Petitioner was adjudged indigent and was appointed counsel by the Hamilton County Court. He entered a plea of not guilty to the charges.

On September 17, 1986, Petitioner's trial counsel filed a written motion for appointment of a psychiatrist or psychologist to assist in Petitioner's defense. The presiding judge orally denied the motion on September 23, 1986. Later, on December 18, 1986, counsel asked the trial court to reconsider its decision denying psychological or psychiatric assistance. At that time, Petitioner's defense counsel noted that they had recently received Petitioner's juvenile court records and psychological evaluations and that those documents revealed mental deficiencies. Counsel further claimed that these deficiencies warranted the appointment of an expert to assist the defense in the presentation of its case. Defense counsel argued that these evaluations also suggested a "neurological component underlying some of his acting out behavior." But the motion was again denied.

Recognizing, however, that Petitioner's mental competency had been placed in issue, on December 23, 1986, the trial judge ordered that Petitioner undergo psychological testing at the court's psychiatric center. Dr. Nancy Schmidtgoessling, a clinical psychologist at the center, was appointed as a "friend of the court" and about a week later performed a psychological evaluation of Petitioner. On January 5, 1987, defense counsel orally renewed their request for the

appointment of an expert to assist them in reviewing Dr. Schmidtgoessling's report "so that [counsel] can understand exactly what it means." (J.A. at 922.) But the trial court once again denied the oral motion "for a psychiatrist or psychologist to be at [their] elbow[s] during the course of the trial, or to have a Court-appointed psychiatrist or psychologist to discuss this Central Psychiatric report with you." (J.A. at 922-23.)

Defense counsel then filed a suggestion of incompetency. On January 6, 1987, approximately one week before trial, Dr. Schmidtgoessling testified in a hearing concerning the results of her competency evaluation of Powell. She stated that she examined Powell for approximately two and one-half hours and found him alert, able to communicate, and able to comprehend not only the charges against him but also the dire consequences of a guilty verdict. She also noted that, due to a psychological deficit, Petitioner had "a conduct disorder, unsociably aggressive, or to use the adult term, he has an anti-social personality." In explanation, Dr. Schmidtgoessling defined an antisocial personality as follows:

> It is a person who essentially acts out the problems instead of psychologically acting it out. They act them out because of guilt and anxiety, and they lack empathy, so they do not appreciate the feelings of other people when they are doing something.
>
> They tend to be pushed and pulled and want short-term goals rather than long-term goals. They are rather impulsive in their acts, meaning they don't subject their acts to critical [thinking]. They just sort of do something because they want to or feel like it.

(J.A. at 929.) Finally, she testified that, although Petitioner has a mild mental defect, his condition did not meet the legal definition of insanity because that defect is not "of sufficient severity to cause him to be incapable of knowing right from wrong or to restrain himself from doing a certain act." (J.A. at 932.)

After Dr. Schmidtgoessling testified regarding Petitioner's competency to stand trial, counsel once again requested psychological assistance, claiming ignorance as to certain psychological terms and an inability to comprehend Dr. Schmidtgoessling's report or to question her on it. The trial judge again denied the motion and found Petitioner competent to stand trial.

Petitioner's trial commenced on January 12, 1987. Defense counsel called Dr. Schmidtgoessling as a defense witness during the guilt phase of the trial, at which time she repeated much of the information she had previously provided in the pretrial competency hearing. Specifically, Dr. Schmidtgoessling noted that Petitioner did not enjoy a nurturing environment as a child and that he was administered Thorazine and other anti-psychotic medications for anxiety and behavior control. She explained that Petitioner's performance on standardized IQ tests showed that he fluctuated between the mild and borderline ranges of mental retardation. Finally, she explained that Petitioner expressed antisocial behavior, that he had "true psychological deficits," that he did not appreciate the feelings of others, had poor impulse control, and overreacted to situations.

The jury convicted Petitioner on the first four counts as well as the lesser included offense of attempted rape. Counsel then moved to hire a neuropsychiatrist to assist Petitioner at the mitigation phase. Although the trial court granted the motion, it once again engaged Dr. Schmidtgoessling from the court psychiatric clinic. The trial court refused to grant a continuance of the sentencing hearing to allow for additional testing of Petitioner, even though Dr. Schmidtgoessling admitted that she was not equipped to conduct the necessary testing for this phase of Petitioner's case. The court did, however, indicate that it would give counsel's request additional consideration if the court's clinician indicated that "they do not have the facilities" to properly evaluate Petitioner.

The trial proceeded to sentencing on January 20, 1987. Defense counsel called Dr. Schmidtgoessling as its only witness during the sentencing hearing. Dr. Schmidtgoessling explained that she was not given sufficient time to conduct an appropriate investigation into Petitioner's mental makeup, to interview necessary family members and acquaintances, or to run needed diagnostic tests. In fact, she admitted during her testimony that she had not even taken the time to interview Petitioner since the initial competency evaluation two weeks prior to trial. Although Dr. Schmidtgoessling indicated that Petitioner likely suffered from some organic brain dysfunction and that such a defect could be detected only with tests that had not yet been performed on Petitioner, she also reinforced her trial testimony that Petitioner was able to perform intentional, purposeful acts, and basically repeated information that she had gathered from her competency evaluation. Dr. Schmidtgoessling admitted that she was "definitely not equipped" to conduct the necessary neuropsychological testing for this phase of Petitioner's case. (J.A. at 1013.) She also claimed that if she had more time she could properly test Petitioner's "psychological makeup by contacting family members and other people." (J.A. at 1012.)

After the mitigation hearing and penalty phase, the jury recommended that Petitioner be put to death on Counts One and Two. The trial court accepted this recommendation and issued an opinion explaining its judgment as required by Ohio Revised Code § 2929.03(F).[1]

---

[1] The court imposed concurrent death sentences on Counts One and Two. Petitioner was further sentenced to a term of ten to twenty-five years' incarceration on Counts Three and Four, which were merged; and to a term of eight to fifteen years' incarceration on Count Five. The sentences on Counts Three through Five ran concurrent with the death sentences on Counts One and Two.

### *Direct Appeal*

Following his convictions, Petitioner took a direct appeal to the First Appellate District Court in Ohio, where he was represented by one of his trial co-counsel as well as a new second counsel. There, he raised the following eleven assignments of error:

(1) The trial court erred to the prejudice of the defendant-appellant by instructing the jury on both counts of the aggravated murder indictment and entering convictions for both aggravated murder counts of the indictment.

(2) The trial court erred to the prejudice of the defendant-appellant in denying the motion for acquittal as to count V of the indictment made by the defendant-appellant at the close of all the evidence.

(3) The trial court erred to the prejudice of the defendant-appellant by denying the motions for acquittal on counts III and IV of the indictment made by defendant-appellant.

(4) The trial court erred to the prejudice of the defendant-appellant in denying the defendant-appellant's motion for acquittal on the two (2) counts of kidnapping.

(5) The trial court erred to the prejudice of the defendant-appellant in denying the defendant-appellant's motion to continue the mitigation hearing.

(6) The trial court erred to the prejudice of the defendant-appellant in failing to properly instruct the jury at the mitigation phase regarding the issue of merger of aggravating circumstances.

(7) The recommendation of the death sentence by the jury and the finding by the court that aggravating circumstances outweighed mitigating factors were against the manifest weight of the evidence.

(8) The trial court erred to the prejudice of the defendant-appellant in denying the motion of the defendant-appellant for a motion to have the defendant referred for further psychiatric testing.

(9) The court erred to the prejudice of defendant-appellant in denying the motion of the defendant-appellant for the appointment of a psychiatrist and psychologist pursuant to Ohio Revised Code, Section 2929.024.

(10) The trial court erred to the substantial prejudice of the defendant-appellant by admitting into evidence inflammatory photographs of the victim.

(11) The trial court erred to the prejudice of the defendant-appellant in denying the defendant-appellant's motion to dismiss at the close of the state's case.

(J.A. at 17.)

On August, 17, 1988, the Ohio Court of Appeals affirmed the trial court's judgment. Specifically, the court of appeals found that these assignments of error were not meritorious; that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt; and that the death sentence was neither excessive nor disproportionate to the penalty imposed in similar cases and was the appropriate penalty.

Petitioner sought leave to appeal with the Ohio Supreme Court, presenting the following seven issues:

(1) The failure to grant a short continuance of the mitigation hearing effectively denies the great latitude in the preparation of evidence of the

mitigating factors guaranteed by Ohio Revised Code § 2929.024 and Ohio Revised Code § 2929.03(D)(1).

(2)     The trial court erred in overruling the appellant's pre-trial motions to hire a psychiatrist to assist in the preparation of the defense after the appellant demonstrated to the court that his sanity at the time of the offense was to be a significant factor at trial.

(3)     Reasonable expert assistance is denied the appellant when the court fails to follow the recommendations of its own appointed expert.

(4)     The finding of guilt by the jury of attempted rape, in violation of Ohio Revised Code § 2907.02, is against the manifest weight of the evidence.

(5)     The finding of guilty by a jury of attempted rape and kidnapping, both of which are aggravated circumstances, is in violation of Ohio Revised Code § 2941.25(A), since both attempted rape and kidnapping are crimes of similar import for which only one (1) conviction can be obtained.

(6)     The finding of guilty by the jury of two (2) counts of kidnapping is against the weight of the evidence.

(7)     The trial court and the court of appeals incorrectly weighed the aggravating circumstances and the mitigating factors, and therefore the sentence of death is against the manifest weight of the evidence.

(J.A. at 18.)

On March 14, 1990, the Ohio Supreme Court affirmed the court of appeal's decision and set Petitioner's execution date as June 12, 1990. On March 27, 1990, Petitioner filed a

motion for reconsideration with the supreme court, wherein he raised the following single issue:

Whether the Appellant was denied due process of law by the Court failing to grant a continuance of the penalty hearing to secure additional evidence related to a mitigating factor.

(J.A. at 244.)

The Ohio Supreme Court denied this motion on April 18, 1990. Petitioner was granted a motion for stay of the execution pending review of his petition for a writ of *certiorari* in the United States Supreme Court. Petitioner sought review of two questions before the United States Supreme Court:

(1)     Is *Ake v. Oklahoma*, 470 U.S. 68 (1985), and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution satisfied by the Trial Court appointing as the sole expert to assist the defense in the sentencing phase a psychologist who admits that further expert assistance is necessary to render competent opinion?

(2)     May a state preclude a capital defendant from presenting mitigating evidence in the penalty phase by denying a continuance which defense counsel has demonstrated through psychological testimony is necessary in order to develop that mitigating evidence?

(J.A. at 19.)    The Supreme Court denied Petitioner's application for a writ of *certiorari*.

### *State Post-Conviction Proceedings*

On June 6, 1991, Petitioner filed a petition for post-conviction relief in an Ohio state court, presenting thirty-five claims for review. The trial court held an evidentiary hearing on March 31 and April 1, 1992 solely on the claim that

Petitioner suffered from organic brain damage. The trial court determined that Petitioner did not suffer from organic brain damage. The court therefore found that Petitioner was not entitled to post-conviction relief and, denied his petition on June 12, 1992.

Petitioner appealed this decision to the Ohio Court of Appeals, presenting ten assignments of error. Before the court rendered its decision, however, Petitioner filed an application for delayed reconsideration in which he claimed that he had been denied the effective assistance of counsel on his direct appeal. He alleged ninety-five issues that his counsel should have pursued on direct appeal.

On August 11, 1993, the court of appeals issued a decision denying the petition for post-conviction relief, finding that none of the assignments of error were well taken. Petitioner then appealed to the Ohio Supreme Court, presenting ten issues. The supreme court overruled the motion.

The court of appeals then denied Petitioner's application for delayed reconsideration on February 22, 1994, finding that he had failed to show good cause for filing the application more than ninety days after the court's judgment had been journalized and more than three years after the Ohio Supreme Court had decided his direct appeal. Petitioner filed a motion for rehearing, which the court of appeals denied on April l4, 1994.

On May 24, 1994, Petitioner raised five propositions of law before the Ohio Supreme Court regarding the court of appeals' denial of his application for delayed reconsideration. The supreme court affirmed the judgment of the court of appeals on August 3, 1994. Petitioner filed a motion for reconsideration, which the supreme court denied on September 21, 1994. The supreme court then set Petitioner's execution for January 5, 1995.

### *Habeas Corpus Petition*

On December 21, 1994, Petitioner filed a motion for stay of execution and a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Ohio. A hearing was held on Petitioner's motion for the stay, and the district court thereafter granted the motion on December 30, 1994. Respondent was ordered to file his return of writ by March 30, 1995. In his petition for a writ of habeas corpus, petitioner raised thirteen grounds for relief, those relevant for purposes of this appeal being as follows:

(1)  The failure and refusal of the state court to provide Petitioner, an indigent, with an expert psychiatrist or psychologist to assist in preparation and/or presentation of the defense during the guilt phase of the case was a violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(2)  The failure and refusal of the state court to provide Petitioner, an indigent, with an expert psychiatrist or psychologist to assist in preparation and/or presentation of the defense during the penalty phase of the case was a violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(3)  The failure and refusal of the state court to grant the petitioner a continuance and an opportunity to conduct additional psychiatric testing and investigation in connection with presentation of his defense at the mitigation hearing was a violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

\* \* \*

(6) Petitioner suffers from organic brain damage and borderline or mild mental retardation. Imposition of the death sentence on Petition [sic] is a violation of the Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

\* \* \*

(11) Petitioner was provided with ineffective assistance of trial counsel in the following respects:

(a) Failure of trial counsel to object to erroneous instructions during the penalty phase of the trial.

(b) Failure to secure a psychiatrist or neuropsychologist in sufficient time to present evidence of Petitioner's organic brain damage.

(c) Failure to object to improper argument by the prosecution.

The lack of effective assistance of trial counsel was a violation of the Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(12) Petitioner's appellate counsel was ineffective in failing to raise the following issues on direct appeal:

(a) The trial court's erroneous instructions to the jury in the penalty phase of the trial, as set forth in the Fifth Claim above.

(b) The trial court's refusal to instruct the jury on the lesser included offenses to aggravated murder.

(c) The trial court's dismissal of the jury foreman and substitution of an alternate during the deliberations in the penalty phase of the trial.

(d) The unconstitutionality of the Ohio death penalty scheme.

(e) The ineffective assistance of trial counsel, as set forth in Claim Eleven above.

(f) The unconstitutionality of imposition of the death sentence upon a person with organic brain damage and/or borderline mental retardation.

(g) Prosecutorial misconduct.

(h) The cumulative effect of all errors at trial.

The lack of effective assistance of appellate counsel was a violation of the Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(13) The cumulative effect of the errors complained of above was a violation of the Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(J.A. at 32-38.)

On June 15, 1998, the district court denied the habeas petition. In its order, the district court granted Petitioner a certificate of probable cause, noting that "questions presented relating to organic brain damage and ineffective assistance of counsel are adequate to deserve encouragement to proceed further." The district court then denied Petitioner's motion under Federal Rule of Civil Procedure 59(e) to alter or amend its judgment. On September 8, 1998, Petitioner filed a notice of appeal to this Court.

## II.  STANDARD AND SCOPE OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2244, *et seq*.) ("AEDPA") was signed into law on April 24, 1996.  The AEDPA significantly transformed the nature of federal habeas corpus proceedings, limiting the possible avenues of relief for convicted persons.[2]  However, the AEDPA does not apply to habeas petitions pending on the statute's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 321-23 (1997); *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997).  Because Petitioner's habeas petition was filed in 1994, the pre-AEDPA standard of review applies.  *See Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999).  Under that standard, we review a district court's legal conclusions in refusing to grant a writ of habeas corpus *de novo*; but we review the district court's factual findings only for clear error.  *Rickman*, 131 F.3d at 1153.  We may issue a writ of habeas corpus only if the state court proceedings were fundamentally unfair as a result of a violation of the Constitution or laws or treaties of the United States.  *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The state court's factual findings are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996).  This presumption only applies to basic, primary or historical facts and "implicit findings of fact, logically deduced because

---

[2] Section 104(2) of the AEDPA redesignated 28 U.S.C. § 2254(d) as § 2254(e).  Section 104(3) of the AEDPA adds a new § 2254(d), which provides that a habeas writ may not issue unless the state court adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Id.* at 1310.  The presumption does not apply to mixed questions of law and fact, or questions of law, both of which are reviewed *de novo*.  *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000); *Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000); *Mapes*, 171 F.3d at 413; *Rickman*, 131 F.3d at 1154.[3]

Although our review of the denial of the habeas petition is governed by pre-AEDPA standards, the scope of our review is governed by the post-AEDPA requirements because Petitioner's notice of appeal from the district court's decision was filed on September 8, 1998, after the effective date of the AEDPA.  We must therefore apply the certificate of appealability ("COA") provisions in the post-AEDPA version of 28 U.S.C. § 2253(c).  *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) (holding that when a habeas petitioner seeks to initiate an appeal of the dismissal of his petition after AEDPA's effective date, the right to appeal is governed by the COA requirements found in § 2253(c), regardless of whether the habeas petition was filed in the district court before AEDPA's effective date).

Pursuant to the post-AEDPA § 2253(c), a COA may issue only upon a "substantial showing of the denial of a constitutional right."  In addition, § 2253(c) requires the COA to "indicate which specific issue or issues satisfy the showing required."  Thus, a petitioner may generally raise on appeal only those specific issues for which the district court granted a certificate of appealability.  Prior to the Supreme Court's decision in *Slack*, the district court issued a certificate of probable cause and not a COA.  The district court issued a blanket certificate of probable cause which, under pre-

---

[3] Petitioner dedicates an entire section of his brief to the presumption of correctness issue and therein cites the proper legal standards for rebutting the presumption and the circumstances in which the presumption does not apply.  However, he fails to articulate particular presumptions that he contests on appeal.

AEDPA standards, would have entitled Petitioner to seek review of all issues decided by the district court.[4] However, we need not remand for issuance of a certificate of appealability because only a few issues merit our discussion. The district court's explicit findings regarding the issues of organic brain damage and the effectiveness of Petitioner's counsel raised substantial questions regarding the possible denial of constitutional protections. Those issues are therefore properly before us on appeal. *See Skaggs*, 235 F.3d at 266.

## III.  DISCUSSION

### A.  Expert Psychological Assistance

In his first and second grounds for federal habeas relief before the district court, Petitioner argued that the trial court's denial of his motions for expert assistance deprived the jury of relevant information concerning his mental history and possible organic brain damage in violation of his due process rights. The district court found no due process violation because the state court adhered to the mandate of *Ake v. Oklahoma*, 470 U.S. 68 (1985), by appointing a neutral psychological expert.

For the reasons set forth below, we find constitutionally harmless any error that may have occurred at the guilt phase of Petitioner's trial; however, we find that the error with respect to the penalty phase of Petitioner's trial mandates reversal as it violated Petitioner's due process rights.

---

[4] The district court's certificate of probable cause indicated, in part, that "the questions relating to organic brain damage and ineffective assistance of counsel are adequate to deserve encouragement to proceed further. For these reasons, it is appropriate that a certificate of appealability be issued in this case for the appeal of these particular grounds." (J.A. at 873.)

### 1.  Constitutional Requirements

In *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment obligates states to provide an indigent defendant with access to psychiatric examination and assistance when the defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial. The Court explained that once this preliminary showing is made, the states must

> at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Id.* *Ake* also held that when appropriate, the right to expert assistance extends to the sentencing phase of capital proceedings.[5] *Id.* at 86. The Court instructed that a

---

[5] This circuit and others have extended *Ake's* command of expert assistance to instances beyond those where a defendant's mental condition is at issue at trial, and beyond those of capital cases. *See, e.g., Glenn v. Tate,* 71 F.3d 1204, 1211 (6th Cir. 1995) (holding that the capital defendant was prejudiced and thereby denied the effective assistance of counsel by his counsel's failure to seek expert testimony at sentencing regarding the defendant's organic brain problem); *Starr v. Lockhart,* 23 F.3d 1280, 1289 (8th Cir. 1994) (noting that *Ake* explains that "due process requires access to an expert who will conduct, not just any, but an appropriate examination," and finding that the petitioner's "exam was inappropriate because it did not delve into the mitigating questions essential to [the petitioner]"); *Terry v. Rees,* 485 F.2d 283, 284 (6th Cir. 1993) (holding that a defendant was denied an opportunity to present an effective defense when the trial court denied his request for an independent pathologist to challenge the government's position as to the

defendant's interest in access to expert assistance outweighs a state's economic interests in avoiding the cost of an expert when the defendant's "mental condition" is seriously at stake in a capital case. *Id.* at 82.

Several circuits have interpreted *Ake* to mean that due process is not satisfied unless the defendant is provided an independent psychiatrist to aid in his defense — i.e., the appointment of a neutral court psychiatrist, such as in the matter at hand, does not satisfy due process. *See, e.g., Starr v. A.L. Lockhart*, 23 F.3d 1280, 1289 (8th Cir. 1994) ("[T]he trial court's . . . finding, that [the defendant's] due process right to expert assistance was satisfied by the court-ordered examination and by the defense's ability to subpoena the state examiners, [was] erroneous [because] the ability to subpoena a state examiner and to question that person on the stand does not amount to the expert assistance required by *Ake*."); *Smith v. McCormick*, 914 F.2d 1153, 1158-59 (9th Cir. 1990) ("[U]nder *Ake*, evaluation by a 'neutral' court psychiatrist does not satisfy due process. . . . [The defendant] was entitled to his own competent psychiatric expert."); *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985) (finding that a state's duty under *Ake* "cannot be satisfied with the appointment of an expert who ultimately testifies contrary to the defense on the issue of competence"); *United States v. Byers*, 740 F.2d 1104, 1114 (D.C. Cir. 1984) (holding that the defendant was denied psychiatric assistance sufficient to prepare an adequate defense where he was only allowed access to psychiatrists for the government).

---

cause of the victim's death); *Dunn v. Roberts*, 963 F.3d 308, 313 (10th Cir. 1992) (finding that under *Ake*, the denial of an expert witness to determine whether the petitioner's mental state was affected by battered spouse syndrome at the time of the offense precluded the petitioner from presenting an effective defense); *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987) (finding that the rule of *Ake* extends to experts in areas beyond that of psychiatry and to instances where the death penalty is not involved, and holding that "the denial of a state-provided expert on hypnosis to assist [the] indigent defendant rendered the trial fundamentally unfair" thereby requiring the conviction to be set aside).

The Fifth Circuit, however, has taken a contrary position, holding that providing "an indigent defendant with the assistance of a court-appointed psychiatrist, whose opinion and testimony is available to both sides," satisfies a defendant's due process rights. *See Granviel v. Lynaugh*, 881 F.2d 185, 191 (5th Cir. 1989). Although the Supreme Court denied Granviel's petition for a writ of *certiorari*, Justice Marshall, joined by Justice Brennan, wrote a sharp dissent to the denial of the petition. *See Granviel v. Texas*, 495 U.S. 963 (1990) (Marshall, J., dissenting). Justice Marshall opined that "[b]ecause the Fifth Circuit's misinterpretation of *Ake* substantially undermines an indigent defendant's ability to present an effective defense, I would grant the petition to reaffirm our holding in *Ake*." *Id.* at 966. The Justice reasoned as follows:

*Ake* was concerned not with establishing a procedure whereby an independent examiner could determine the validity of a defendant's insanity defense and present his findings to both parties and to the court. Rather, *Ake* was directed at providing a defendant with the tools necessary to present an effective defense within the context of our adversarial system, in which each party marshals evidence favorable to its side and aggressively challenges the evidence presented by the other side. In that adversarial system, "the psychiatrists for each party enable the [court or] jury to make its most accurate determination of the truth on the issue before them." [470 U.S.], at 81. Thus, we recognized in *Ake* that a defense psychiatrist is necessary not only to examine a defendant and to present findings to the judge or jury on behalf of the defendant, but also to "assist in preparing the cross-examination of a State's psychiatric witnesses," *id.*, at 82, and in determining "how to interpret their answers," *id.*, at 80. Just as an indigent defendant's rights to legal assistance would not be satisfied by a State's provision of a lawyer who, after consulting with the defendant and examining the facts of the case and the applicable law, presented everything he knew about the defendant's guilt to the defendant, the prosecution, and

the court, so his right to psychiatric assistance is not satisfied by provision of a psychiatrist who must report to both parties and the court.

*Id.* at 964-65.

Today, we join with those circuits that have held that an indigent criminal defendant's constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a "neutral" psychiatrist — i.e., one whose report is available to both the defense and the prosecution. *See Starr*, 23 F.3d at 1289; *Smith*, 914 F.2d at 1559; *Sloan*, 776 F.2d at 929; *Byers*, 740 F.2d at 1114. As a result, in the matter before us, so long as Petitioner made the requisite preliminary showing that his sanity at the time of the offense was to be a "significant factor at trial," the trial court erred in failing to grant Petitioner's motion for an independent psychiatrist. *See Ake*, 470 U.S. at 83.

Since *Ake*, the Supreme Court has ruled that an indigent criminal defendant seeking psychiatric assistance must base his preliminary showing on more than a general statement of need; rather, he must support his request with specific facts. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985). Here, one month prior to trial, Petitioner's attorneys produced Petitioner's juvenile court records and psychological evaluations, alleging that these documents revealed mental deficiencies that should lead to the appointment of an expert to assist the defense in the presentation of its case. One of the reports, prepared in June of 1987 when Petitioner was only eleven years old, noted that he was then non-verbal and defensive, although he did not "demonstrate any signs of a disturbed thought process or bizarre thought pattern." The report further stated that Petitioner's full-scale IQ score was only 64, placing him in the "mild mentally retarded range of intellectual ability." (J.A. at 667.) The report concluded, "not only does [Petitioner] perceive physical aggression as not being wrong, but tends also to value aggression and accepts it as a fact of life." (J.A. at 668.)

The remaining two reports received by defense counsel involved examinations of Petitioner when he was fourteen years old. Those evaluations, conducted two days apart, revealed that Petitioner then had a full scale IQ of 70. The reports also indicated that Petitioner did not do well "in recognizing cause and effect relationships in social situations." (J.A. at 670.) However, the reports further noted that the examiners could not uncover any evidence of psychotic process or organic dysfunction. Petitioner was described in summary as "a rather low-functioning youngster with a conduct disorder of a[n] unsocialized, non-aggressive reaction." (J.A. at 670.)

Like the district court, we believe that Petitioner provided the trial court with the necessary particularized facts sufficient to trigger *Ake's* requirement of psychiatric assistance. Unlike in *Caldwell*, where the defendant presented little more than "undeveloped assertions" that the requested assistance would aid in his defense, Petitioner provided the trial court with specific facts relevant to his defense at both the guilt and penalty phases of his trial. Accordingly, the trial court erred in denying Petitioner's motion for independent psychiatric assistance. However, as explained below, we find the error in relation to the guilt phase of Petitioner's trial constitutionally harmless. The error in relation to the penalty phase of Petitioner's case presents a different scenario requiring reversal.

**2.   Guilt Phase of Petitioner's Trial**

*Ake* guarantees an indigent criminal defendant the basic tool of a court-appointed expert to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *See Ake*, 470 U.S. at 83. Here, while we find that the district court erred in failing to appoint an independent psychiatrist to guarantee Petitioner's rights to an appropriate examination and to aid in his defense, based on the record before us, the trial court's error was harmless.

The Supreme Court has held that certain errors which are so elemental that their existence abrogates the basic structure

of a constitutional trial, such as the deprivation of the right to counsel, can never be subject to harmless error analysis, *see Arizona v. Fulminante*, 499 U.S. 279, 306-07, 309-10 (1991); however, the Court has also held that mere "trial error," such as when counsel has performed deficiently, may be subject to a harmless error review. *See id.; United States v. Morrison,* 449 U.S. 361, 365 (1981) (recognizing that "certain violations of the right to counsel may be disregarded as harmless error"). In this case, we find that the denial of expert psychiatric assistance as guaranteed by *Ake* to be more akin to trial error, such as that where counsel has performed deficiently, and is thus subject to harmless error review. *See Starr*, 23 F.3d at 1291. Unlike the case where a defendant has been denied the right to counsel completely, thereby constituting a structural defect, the denial of an *Ake* expert may deprive the defendant of a basic tool necessary to his defense, but that denial may not always result in prejudice to the defendant. *See id.*

With that said, the Supreme Court has instructed us that trial errors in habeas proceedings are subject to the harmless error standard enunciated in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), and recognized in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), as well as in *O'Neal v. McAninch*, 513 U.S. 432 (1995). Specifically, the Court has instructed that "trial errors, including errors in respect to which the Constitution requires state courts to apply a stricter . . . standard of 'harmless error' review when they review a conviction directly[,]" are to be reviewed as to "whether the error had a substantial and injurious effect on the jury's verdict[,]" such that if the reviewing court "is in grave doubt as to the harmlessness of an error, the habeas petitioner must win." *California v. Roy*, 519 U.S. 2, 4-5 (1996) (internal quotation marks and citations omitted). Here, upon thorough review of the record before us, we are not left in grave doubt as to the harmlessness of the trial court's failure to provide Petitioner with an independent court-appointed psychiatrist because we do not believe that the court's error had an injurious effect on the jury's verdict.

Petitioner's convictions at issue were based upon the charges of aggravated murder during a kidnapping and aggravated murder with a rape specification. Under Ohio law, "[a]ggravated murder requires purposefully causing the death of another while committing or attempting to commit one of nine specified felonies." *Shoemaker v. Morgan*, No. 9-01-35, 2001 WL 15626939, at *1 (Ohio Dec. 19, 2001). Based on the record before us, there is no question that Petitioner kidnapped Trina for the purpose of raping her, or that he purposefully threw her out of the window — the act which ultimately caused her death. Specifically, the facts show that upon leaving the building just after throwing Trina out of the window, Petitioner mumbled to Shirley Lee, "I did what I intended to do to that bitch[,]" thereby indicating that he intentionally inflicted Trina with this ultimately fatal injury. *See State v. Powell*, 552 N.E.2d at 193. In addition, after being apprehended, Petitioner admitted to police that he had taken Trina because he intended to "fuck" her, thereby admitting to the predicate felonies of kidnapping and rape. *See id.* Under these facts, we view the error as harmless. Even if an independent psychiatrist had been appointed, it would not have changed the fact that by his own admission, Petitioner kidnapped Trina intending to rape her, and then purposefully threw Trina to her ultimate death in order to protect himself — he "had" to throw her out of the window because he heard individuals responding to Trina's cries for help. Petitioner's own admissions provide the basis for a jury to find that he was capable of performing purposeful acts, and that he in fact committed the acts which led to Trina's death. *See Starr*, 23 F.3d at 1292-93 (holding that the trial court's failure to appoint an independent *Ake* psychiatrist was harmless error where the facts indicated that the defendant had intentionally inflicted the injury which led to the victim's death in connection with the defendant's conviction for capital or felony murder, even when using the higher "harmless beyond a reasonable doubt" standard). This was not a case where the prosecution had to prove premeditation and deliberation in order to prove that the defendant intended to murder his victim. Rather, under Ohio law, the prosecution had to prove only that Petitioner purposefully caused Trina's

death, and Petitioner himself admitted that he did so because he "had" to.

We are not persuaded otherwise by the testimony of Dr. James Tanley, a psychologist whose services Petitioner eventually obtained following his conviction. Dr. Tanley did not examine Petitioner until March 22, 1991; it was therefore necessary for him to testify several years after the trial proceeding concerning Petitioner's mental condition at the time of the crime. Dr. Tanley testified that in his opinion, Petitioner's alleged organic brain damage together with his low IQ and other factors compromised Petitioner's ability to think cognitively, such that Petitioner had significant difficulty in conforming his actions to the requirements of the law at the time of the offense. Although we recognize this testimony, we do so while also recognizing the testimony of Dr. Schmidtgoessling, as well as Petitioner's own actions and statements, to the contrary. Moreover, Dr. Tanley's testimony that Petitioner "had significant difficulty . . . conforming his conduct to the requirements of the law" (J.A. at 1131) falls short of Ohio's standard for insanity applicable at the time of Trina's murder; namely, whether Petitioner lacked the capacity to conform his conduct to the requirements of the law. *See State v. Staten*, 247 N.E.2d 293, 299 (Ohio 1969) (providing, in relevant part, Ohio's pre-1990 definition of insanity as being that where one accused of criminal conduct "does not have the capacity . . . to conform his conduct to the requirements of the law"); *State v. Luff*, 621 N.E.2d 493, 498-99 (Ohio Ct. App. 1993) (holding that the application of Ohio's 1990 amendments regarding insanity to a defendant's mental state before 1990 violated the ex post facto clauses of the United States and Ohio Constitutions). In other words, Dr. Tanley's after-the-fact post-conviction testimony does nothing to change the harmlessness of the trial court's error because the fact that one has difficulty conforming his conduct to the requirements of the law `is not enough to prove insanity; one must demonstrate the lack of capacity to do so.

Thus, upon our review of all of the evidence through the prism of a harmless error standard, we are not left in "grave

doubt" as to the harmlessness of the trial court's error because we do not believe that the failure to appoint an independent psychiatrist had a substantial and injurious effect on the jury's verdict when considering the record as a whole. We therefore hold that Petitioner's claim on this issue in relation to the guilt phase of his trial must fail. However, the same cannot be said with respect to error in relation to the penalty or sentencing phase of Petitioner's trial. As found by the Eighth Circuit, "the issue of mitigation . . . is different from that of guilt." *See Starr*, 23 F.3d at 1289.

### 3. Penalty Phase of Petitioner's Trial

Under Ohio's death penalty statute, the trial jury was required to weigh against the aggravating circumstances of the crime "the history, character, and background of the offender," among other things. Ohio Rev. Code § 2929.04(B). The jury was also required to consider whether, "because of a mental disease or defect," the offender "lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Ohio Rev. Code § 2929.04(B)(3). And the jury was required to consider "[a]ny other factors that are relevant to the issue of whether the offender should be put to death." Ohio Rev. Code § 2929.04(B)(7).

*Glenn v. Tate*, 71 F.3d 1204, 1206-07 (6th Cir. 1996). However, as this Court has recognized, a "jury could consider none of these matters, of course, if the relevant facts were not placed before it." *Id.* at 1207.

The trial court's denial of an *Ake* expert in this case cannot be considered harmless error inasmuch as, by her own admission, Dr. Schmidtgoessling was not equipped to conduct the appropriate examination required for her to set forth all of the facts or information the jury should have considered at mitigation. Dr. Schmidtgoessling began by acknowledging that "mitigation is a much broader question than addressed to date . . . and if the Court wants a full understanding, I feel it is important to use the techniques to answer those questions."

(J.A. at 1026.)  She then went on to explain that neither she nor any other staff member at the court's psychiatric clinic were qualified to conduct the type of testing and evaluation that was required to diagnose Petitioner with organic brain damage for the purpose of showing the effect of that factor at mitigation.  Dr. Schmidtgoessling indicated that such testing would require a referral to a comprehensive medical facility and specialists in the appropriate fields—precisely the type of assistance Petitioner sought but was denied.

Accordingly, under these facts, unlike with the guilt phase of Petitioner's trial, the testimony of an independent psychiatrist — particularly one who was qualified to conduct the appropriate testing of which Dr. Schmidtgoessling spoke — may have provided facts and information for the jury to consider at mitigation, which may have led to a different recommendation by the jury at sentencing.  We therefore believe that the lack of the expert assistance which Petitioner sought, and which he was entitled under *Ake*, "had a substantial and injurious effect or influence in determining the jury's" decision at sentencing, *see Brecht*, 507 U.S. at 637, such that we are left in "grave doubt" as to the harmlessness of this error, thereby requiring that relief be granted to Petitioner on this issue.  *See O'Neal*, 513 U.S. at 437.

We add that even if we were to have followed the Fifth Circuit's rationale that a neutral psychiatrist is sufficient to meet *Ake's* command, Petitioner would still prevail on this issue in connection with the penalty phase of his trial.  Dr. Schmidtgoessling testified that she was not qualified to conduct the type of examination necessary for mitigation.  As a result, Petitioner was denied the very type of assistance for which *Ake* provides — "an appropriate examination" — even if we were to have agreed that Dr. Schmidtgoessling's assignment to Petitioner's case was enough.

For the above-stated reasons, we hold that while Petitioner's due process rights were violated by the trial court's failure to appoint an independent psychiatrist as requested by Petitioner, the error was constitutionally

harmless at the guilt phase of Petitioner's trial; however, the error in relation to the penalty phase of Petitioner's trial requires reversal, thus mandating that Petitioner's death sentence be vacated and a new mitigation hearing conducted.

## B.   Denial of Motion for a Continuance

After the guilt phase of the trial, Petitioner's counsel sought a continuance for the purpose of obtaining an additional psychiatric examination for presentation at the mitigation hearing, which the trial court denied.  Because we believe that the trial court should have granted Petitioner's motion for a continuance, we also grant the writ on this basis.

The decision whether to grant a motion for continuance is within the discretion of the trial judge.  *See Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964).  Absent proof of a violation of a specific constitutional protection, a habeas petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  A petitioner must also show that the denial of his request resulted in actual prejudice to his defense.  *See United States v. Moreno*, 933 F.3d 362, 372 (6th Cir. 1991).  Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise benefited the defense.  *See United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984).

Among the factors to be considered by the court in determining whether a continuance was properly denied are the length of the requested delay; whether other continuances had been requested and granted; the convenience or inconvenience to the parties, witnesses, counsel and the court; whether the delay was for legitimate reasons or whether it was "dilatory, purposeful or contrived;" whether the defendant contributed to the circumstances giving rise to the request; whether denying the continuance will result in identifiable prejudice to defendant's case; and the complexity of the case.  *See United States v. Burton*, 584 F.2d 485, 490-91 (D.C. Cir. 1978).

Applying the balancing test set forth in *Burton*, the district court determined that although Petitioner's request was justifiable and that some of the factors weighed in his favor, there was no abuse of discretion on the part of the state trial court. The court also took issue with the fact that counsel did not specify the length of the continuance requested. The court further found that additional testing was not necessary based upon the rationale that Dr. Schmidtgoessling had already testified that organic brain damage would have a minimal impact on Petitioner's thought processes. Finally, the court determined that any delay in the sentencing phase of a trial causes inconvenience to members of the jury and creates a further disruption in their lives. Based on its resolution of Petitioner's first and second grounds for habeas relief (the *Ake* claims), the court concluded that Petitioner suffered no actual prejudice by the trial court's refusal to grant a continuance for purposes of obtaining an additional psychological evaluation.

On appeal, Petitioner contends that the district court incorrectly weighed the relevant factors of the *Burton* test. Based upon our holding that the sentencing phase of petitioner's trial was fundamentally unfair, we must agree. Dr. Schmidtgoessling's testimony did not fully answer the questions Petitioner sought to answer if he had been given additional time. While the district court focused on Dr. Schmidtgoessling's testimony that subtle organic brain damage would have little impact on an individual, it failed to consider the fact that Dr. Schmidtgoessling was not even qualified to diagnose, much less measure, the extent of Petitioner's alleged organic brain damage. She explained that evaluation by specialists was necessary to diagnose and understand the type and extent of Petitioner's alleged organic impairment, particularly for purposes of Petitioner's mitigation hearing.

Accordingly, Petitioner's request was neither dilatory nor contrived, he did not contribute to the request, and by all appearances the request would not have inconvenienced Dr. Schmidtgoessling or any other witness. Although the court found that further delay would have disrupted the jury

members' lives, we believe that any inconvenience to the jury in this regard pales when compared to the gravity and magnitude of the issue involved—i.e., whether the death penalty should be imposed. *See Burton*, 584 F.2d at 490-91. In addition, the denial of a continuance prejudiced Petitioner because the additional time would have afforded him the opportunity to gather additional mitigation evidence from his family and friends as well. *See id.*

We therefore hold that the district court erred in upholding the trial court's denial of Petitioner's request for a continuance, and grant the writ on this basis as well.

## C.   Ineffective Assistance of Trial Counsel

Although Petitioner waived or defaulted most of his ineffective assistance of counsel claims, he properly presented the following claims in Ohio state courts: (1) trial counsel failed to properly investigate and introduce mitigating evidence during the penalty phase; and (2) counsel failed to obtain proper expert testimony in time to present evidence of organic brain damage at the guilt and penalty phases of the trial. The district court rejected these claims, finding that Petitioner's counsel "diligently pursued the appointment of a psychological or psychiatric expert as found by the state courts" and reasonably relied on Dr. Schmidtgoessling to present the background evidence in question. (J.A. at 854, 859-61.) On appeal, Petitioner argues that his trial counsel were ineffective in two ways: by failing to investigate his background for mitigating evidence, and by consequently failing to introduce at the sentencing hearing the mitigating evidence which proper investigation would have discovered. Petitioner asserts that the trial court's denial of counsel's repeated requests for a defense expert caused him to be deprived of the effective assistance of counsel.

To establish a violation of the Sixth Amendment right to counsel, a defendant must demonstrate that counsel's representation was deficient and that it actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Representation is deficient when it falls below an objective

standard of reasonableness under prevailing norms. *See Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000). The claimant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In considering the "prejudice" factor, the Supreme Court has held that even professionally unreasonable errors do not justify setting aside the judgment of a criminal proceeding "if the error[s] had no effect on the judgment." *Id.* at 691. A petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The ultimate focus of the collective inquiry is the fundamental fairness of the proceeding. In this vein, we must determine whether the result of the proceeding is unreliable "because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 695. This Court has adopted the *Strickland* standards in its habeas jurisprudence. *See Rickman*, 131 F.3d at 1155; *Groseclose v. Bell*, 130 F.3d 1161, 1168 (6th Cir. 1997).

Upon review of Petitioner's claims, we conclude that he cannot meet the *Strickland* standard with respect to his counsel's performance at the guilt phase of the trial. However, we hold that Petitioner was prejudiced by his counsel's ineffective assistance at the penalty phase.

### 1.  Guilt Phase of Petitioner's Trial

Petitioner contends that his representation at the guilt phase was ineffective because defense counsel failed to retain a necessary defense expert to evaluate and testify that, given Petitioners's mental limitations and problems, he should not have been found guilty of aggravated murder. Petitioner faults defense counsel for relying solely on a neutral expert. However, the record reflects that Petitioner's trial counsel made repeated motions for the court to provide partisan expert psychological assistance. Petitioner contends that regardless

of whether trial counsel attempted to secure a qualified expert, the fact that trial counsel's "failure" was "court-induced" does not mean that his counsel's performance met or exceeded an objective standard of reasonableness. Petitioner's failure to support his bald-faced assertions with legal authority is not surprising; his counsel's repeated requests for independent expert assistance were reasonable under an objective standard, such that any failure of the court to grant counsel's repeated requests cannot be attributed to that counsel. Furthermore, even if Petitioner could show some deficiency in his trial counsel's performance at the guilt phase, he has failed to demonstrate that he was prejudiced by his counsel's failed attempts to secure a defense expert. *See* Part A.2., *supra*.

### 2.  Penalty Phase of Petitioner's Trial

Petitioner claims that although his trial counsel had several months to prepare for the penalty phase of his trial, they spent less than two full business days preparing, waiting until after the conclusion of the guilt phase to do so. Incredibly, counsel's mitigation testimony consisted of only one witness — Dr. Schmidtgoessling. By calling Dr. Schmidtgoessling to testify, counsel permitted the jury to again hear testimony regarding Petitioner's capacity to form the intent and purpose to commit aggravated murder. Dr. Schmidtgoessling agreed with the prosecutor's suggestion that "it is a good thing that [Petitioner] is not bigger, stronger, heavier and smarter, or he would be just that much more dangerous." The record reflects that numerous family members and other individuals from Petitioner's past were willing to testify on his behalf at the sentencing phase; however, defense counsel did not interview any of Petitioner's family members or friends. Counsel failed to investigate, research, or collect pertinent records regarding Petitioner's background or history for mitigation purposes, and made no attempt to locate significant persons from Petitioner's past who may have provided valuable testimony regarding mitigating factors. Although Dr. Schmidtgoessling made vague references to Petitioner's family history and background, she was not able to fully

describe to the jury the extent of Petitioner's background, history, and character for mitigation purposes, because, as she herself mentioned, she did not have time to interview his relatives.

We have no doubt that this performance fell below objectively reasonable standards of professional conduct. *See Strickland*, 466 U.S. at 687-88. Ohio law provides that in a capital sentencing proceeding, the jury shall weigh against the aggravating circumstances "the nature and circumstances of the offense, the history, character, and background of the offender" as well as "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law" and "[a]ny other factors that are relevant to the issue of whether defendant should be sentenced to death." Ohio Rev. Code § 2929.04. In addition, the American Bar Association's Professional Standards state that a "lawyer has a duty to investigate 'the circumstances of [the client's] case and to explore all avenues relevant to the merits of the case and the penalty in the event of a conviction." The ABA Standards further provide that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. *Investigation is essential to fulfillment of these functions*." 1 ABA Standards for Criminal Justice, Standard 4-4.1 (1982 Supp.) (emphasis added).

In light of these universally recognized principles, this Court has taken great pains to insure that defendants do not suffer at the hands of defense counsel who fail to make a proper investigation for the penalty phase. *See, e.g., Carter,* 218 F.3d at 596-97 (finding ineffective assistance of counsel where counsel failed to investigate petitioner's family, social, or psychological background); *Mapes*, 171 F.3d at 426; *Rickman*, 131 F.3d at 156 (holding that failure to investigate for the sentencing phase is "certainly indicative of a seriously deficient performance"); *Austin v. Bell*, 126 F.3d 843, 848

(6th Cir. 1997) (finding that failure to interview available friends and family members "does not reflect strategic decision, but rather an abdication of advocacy.").

Although defense counsel is accorded deference in making decisions as part of a sound trial strategy, defense counsel must first perform a necessary investigation before the decision of whether to present evidence may be considered trial strategy. *See Strickland*, 466 U.S. at 689-91. In *Austin*, 126 F.3d at 849, we recognized that the failure to present mitigating evidence when it was available could not be considered a strategic decision, but rather, an "abdication of advocacy." Here, as in *Austin*, we find that defense counsel failed to make reasonable investigative efforts. Defense counsel should have conducted their own investigation and presented the available witnesses and testimony regarding mitigation. Even if counsel could have anticipated Dr. Schmidtgoessling's testimony and chose not to present other witnesses as a matter of trial strategy, this alleged strategic decision cannot be reasonable because counsel failed to preserve options by failing to make even a limited investigation.

Our decision in *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), is also instructive. *Skaggs* involved trial counsel's use of an inept expert witness at both the guilt and penalty phases of a capital criminal trial. The "psychologist" in that case was both incompetent and fraudulent, having delivered bizarre and eccentric testimony during the guilt phase. We determined that although "it was not unreasonable to have used [the expert] during the guilt phase of the trial, counsel's decision to use [the expert] again at the penalty phase presents us with an entirely different question." *Id.* at 269. We found that counsel should have found a different psychiatric expert for trial of the penalty phase, and that this deficient performance resulted in presentation of essentially no mitigating evidence at all, especially on the one topic which may have convinced jury that the death sentence was not justified—the defendant's mild mental retardation and his diminished mental capacity. *Id.*

Similarly, in the case at bar, Dr. Schmidtgoessling expressed her own lack of competence or inability to provide evidence that Petitioner suffered from a diminished mental capacity due to organic brain damage. Although counsel's performance cannot be deemed insufficient on this ground alone, Dr. Schmidtgoessling's inability to provide conclusive evidence regarding organic brain damage made other avenues of investigation all the more crucial. Under these circumstances, we believe that Petitioner's counsel "acted below an objective standard of reasonableness at sentencing, essentially providing no legitimate mitigating evidence on [Petitioner's] behalf, and . . . this failure severely undermines our confidence in the just outcome of this proceeding." *Skaggs*, 235 F.3d at 269.

We also find that Petitioner was actually prejudiced by his counsel's deficient performance. Respondent asserts that Petitioner's trial counsel presented evidence of Petitioner's background via the testimony of Dr. Schmidtgoessling. Respondent argues that the background evidence Petitioner alleges he would have received had his counsel made a proper investigation was cumulative of the information provided via Dr. Schmidtgoessling's mitigation testimony. We disagree.

The additional information Petitioner sought to adduce was contained in several affidavits from friends and family members. The district court determined that while much of the information contained therein was pertinent mitigating evidence, counsel was able to present this information to the jury through Dr. Schmidtgoessling and that counsel's performance fell within the "wide range of reasonable professional assistance." But if counsel had actually conducted an investigation and produced pertinent witnesses, jurors would have heard first-hand accounts from those who knew Petitioner best. We believe that such personal testimony would have been of significant benefit during the penalty phase. Furthermore, Dr. Schmidtgoessling never met with Petitioner's family members or friends, so as to have considered any mitigating information they may have provided:

Q    You have discussed then further tests that would be necessary in order to ascertain whether or not Tony Powell has organic impairment; is that correct.

A    Yes, that is correct.

Q    Doctor, do you feel that these tests are necessary to complete a mental examination of Mr. Powell to get an accurate picture of him?

A    Yes, I do.

Q    Do you feel there is anything else needed for your examination which you were not able to do because of the time constraints?

. . . .

A    Ordinarily I would feel testing someone's psychological makeup by contacting family members and other people who know that person well, teachers, employers. I did not have time to do that over the weekend.

(J.A. at 1011-12.)

Moreover, Dr. Schmidtgoessling presented damaging information to the jury. As we recently held in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), presenting such damaging information, especially when first having failed to conduct a proper investigation, constitutes sufficient grounds to believe that the jury would have decided differently on the mitigation factors:

The defense theory was that Combs's intoxication rendered him unable to act with purpose or prior calculation and design, and yet defense counsel made two crucial errors that substantially undercut this theory. We conclude that each of these errors is sufficiently prejudicial to satisfy the *Strickland* standard. . . . Presentation of Dr. Fisher's testimony is perhaps the

most devastating error. *The testimony of the sole defense expert that Combs, although intoxicated, nevertheless acted with purpose and intent was obviously damaging to the defense. Furthermore, Dr. Fisher's testimony provided the State with its most powerful evidence of purpose.*

*Id.* at 290 (emphasis added). Similarly, in the instant case, Dr. Schmidtgoessling testified that it "was a good thing [Petitioner] is not bigger, heavier, or smarter, or he would be just that much dangerous." (J.A. at 444.) Incredibly, the prosecution even cited a large portion of Dr. Schmidtgoessling's mitigation testimony in support of its closing argument at the penalty phase.

We find the above analysis particularly significant because, at one point in its sentencing deliberations, the jury informed the court that it was "at a stalemate" and could not agree whether to impose a death sentence. The jury's apparent difficulty in reaching a decision regarding the appropriate penalty to impose under these facts leads us to believe that if counsel had conducted a proper investigation and had presented competent proof of mitigation, "there is a reasonable probability that the result would have been different." *See Skaggs*, 235 F.3d at 271 (citing *Williams v. Taylor*, 120 S.Ct. 1495, 1519 (2000)). We therefore hold that Petitioner was prejudiced by his counsel's ineffective assistance at the sentencing phase, and grant the writ on this basis as well.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of Petitioner's application for a writ of habeas corpus as to the penalty phase and **AFFIRM** as to the guilt phase of Petitioner's trial; and we **REMAND** to the district court with instructions to issue a writ of habeas corpus vacating Petitioner's death sentence unless the State of Ohio conducts a new penalty phase proceeding within 180 days of remand. If the State does elect to conduct such a proceeding, we presume that the state court will first have to determine

whether Petitioner can be lawfully executed under the Eighth Amendment due to his mental retardation in light of the Supreme Court's decision in *Atkins v. Virginia*, ___ U.S. ___, 122 S. Ct. 2242 (2002). Should the state court determine that Petitioner's claim fails under *Atkins*, the prosecution would be free to conduct a new penalty phase proceeding if it chooses to do so.

**CONCURRING IN PART, DISSENTING IN PART**

MARTHA CRAIG DAUGHTREY, concurring in part and dissenting in part. Although I agree with the majority's view that constitutional error requires a remand in this case for a new sentencing hearing, I cannot agree with its conclusion that the same error is harmless in connection with the jury's determination of the defendant's guilt.

There can be no question that entrenched principles of due process require greater protections for indigent capital defendants suffering from mental defect or disease than the limited assistance allowed Powell in his trial. In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the United States Supreme Court confirmed that a defendant's indigency cannot constitutionally result in a lesser standard of justice than that accorded to defendants of greater financial means. As noted in *Ake*:

> This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.

*Id.* at 76.

After confirming the essential role fulfilled in many criminal trials by expert psychological testimony, the Court then explicitly held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and *assist in evaluation, preparation, and presentation of the defense*.

*Id.* at 83 (emphasis added). Based on the record before us, it is obvious that in their decisions, the Ohio courts and the district court have misapplied *Ake* in this case.

The Supreme Court was explicit in *Ake* and in other, prior decisions that due process mandates provision of the "basic tools of an adequate defense" to indigent defendants. *See, e.g.*, *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). The duty of a trial court thus involves determining "whether, and under what conditions," requested expert assistance must be offered. *See Ake*, 470 U.S. 77. In doing so, courts should examine three essential factors:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Id.*

Clearly, in a death penalty proceeding, the private interest in receiving all assistance necessary for a sound defense far outweighs any governmental interest in cost savings, quicker trials, or other matters important to the relevant governmental body. The focus is thus upon the value of the additional, requested safeguards to the quest for justice. Citing *Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993), the district court noted that this court has expanded the *Ake* holding beyond those cases in which sanity is a significant factor at trial by concluding that the defendant in *Terry* "was deprived of the opportunity to present an effective defense when he was

denied an independent pathologist in order to challenge the government's position as to the victim's cause of death." *Id.* The court in *Terry* also recited the *Ake* principle that "[c]riminal trials are fundamentally unfair if a state proceeds against an indigent defendant without making certain that he has access to the raw materials integral to building a defense," *id.*, and stated broadly (and correctly) that "[f]undamental fairness entitles an indigent defendant to an adequate opportunity to present his claims fairly within the adversary system." *Id.*

Applying these constitutional principles and the law of the circuit, the district court noted "that the Fourteenth Amendment's due process guarantee of fundamental fairness may require the State to provide expert assistance to a criminal defendant in cases other than those where the defendant's sanity is in issue." Nevertheless, in this matter, the district court determined that Powell was *not* entitled to the assistance of a psychiatric or psychological expert because, "although petitioner's mental condition was seriously in issue in this case, Dr. Schmidtgoessling adequately fulfilled the role of a defense expert." The majority on appeal has recognized the error in this ruling, but holds that the error is harmless. I cannot agree.

Without question, an indigent criminal defendant has no constitutional right "to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id.* Such a defendant, however, must have at least access to "a competent psychiatrist for the purpose . . . discussed [by the Supreme Court in *Ake*.]" *Id.* In this matter, the Ohio state courts and the federal district court concluded that Powell's constitutional rights were adequately protected because the petitioner had "access" to Dr. Schmidtgoessling and to her reports. Despite the fact that Powell's attorneys were forced to call Schmidtgoessling as their own witness, however, the mental health professional appointed to evaluate Powell as a "friend of the court" did not, and indeed could not, fulfill the function demanded of her by the due process provisions of the federal constitution.

Schmidtgoessling did offer testimony that was at least in part beneficial to the petitioner. Moreover, Powell's attorneys, without question, were afforded access to Schmidtgoessling and to the reports she prepared *for the court*. What Powell and his defense team was not allowed, however, was a very integral part of the very protection discussed in *Ake* – the expert assistance necessary to "assist in evaluation, preparation, and presentation of a defense." *Id.* at 83. As explained by the Supreme Court:

> [W]ithout the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high.

*Id.* at 82.

The majority concludes that the trial court's error in failing to appoint an independent expert to assist defense counsel in this case was harmless because the "Petitioner's own admissions provide the basis for a jury to find that he was capable of performing purposeful acts, and that he in fact committed the acts which led to Trina's death." While there can be no fault found with the ultimate conclusion -- that the petitioner did indeed cause Trina's death -- the fact that he appeared to act "purposefully" begs the ultimate question in this case. Neither the petitioner's acts at the time of the offense, nor his statements immediately afterward, can be taken as conclusive of his ability to *control* his actions. Obviously, without the assistance of an expert, the petitioner was hamstrung in his efforts to challenge any of the conclusions reached by the "friend of the court." Furthermore, as revealed during the post-conviction proceedings in this matter, Dr. James Tanley, a mental health expert whose services Powell was finally able to obtain, *did* conclude that Powell suffered from organic brain damage and that the damage, together with the defendant's low IQ and

other factors, compromised Powell's ability to think cognitively, such that the defendant might not have been able to conform his conduct to the requirements of the law at the time of the crime. Consequently, the validity of the petitioner's conviction stands questioned as a result of the trial court's refusal to allow the defendant constitutionally-mandated assistance in the *preparation* of his defense. I fail to see how this deprivation can be considered harmless under all the circumstances of this case.[1]

It is not only the access to test results that *Ake* requires; if such access were the extent of the due process protections afforded indigent criminals whose sanity and mental

---

[1] With what I consider to be unwarranted certitude, the majority attempts to bolster its conclusion that this denial of fundamental due process is nevertheless harmless by asserting that "Dr. Tanley's testimony that Petitioner 'had significant difficulty . . . conforming his conduct to the requirements of the law' falls short of Ohio's standard for insanity applicable at the time of Trina's murder; namely, whether Petitioner lacked the capacity to conform his conduct to the requirements of the law." In so doing, the majority imposes upon spontaneous testimony a requirement of legal precision that might well obscure the true meaning of the opinion offered. The relevant colloquy with Dr. Tanley included, in fuller exposition, the following exchange:

Q. Do you have an opinion based upon a reasonable degree of neuropsychological or scientific certainty as to whether at the time of the offense Mr. Powell because of a mental disease or defect lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law?
A. Yes, I do.
Q. Could you tell the Court what that opinion is?
A. My opinion Mr. Powell had significant difficulty with the second part of that statement, that is conforming his conduct to the requirements of the law.

The majority's argument that, in such a context, the concepts of "lack of capacity" and "significant difficulty" can never be construed synonymously is, in my judgment, disingenuous. Instead, I would hold that the *possiblity* that Powell's "significant difficulty" in conforming his conduct to legal requirements was, in fact, his lack of capacity to do so, creates at least a "grave doubt" as to the harmlessness of the error.

---

culpability at the time of the crime are called into question, lawyers untrained in psychology and psychiatry could be flooded with data and opinion with no legitimate opportunity to understand, question, or dispute the material. Instead, the clear language of *Ake* provides that basic principles of due process and justice require that defendants presented with such information must also be provided assistance in neutrally evaluating the disclosures and preparing, if possible, an adequate defense to the findings. Significantly, that possibility was not afforded the petitioner at trial. Again, I cannot see that such an error can be considered harmless.

For these reasons, I would reverse the district court's judgment in its entirety and remand for issuance of a writ that would mandate a new trial for the petitioner, as well as a new sentencing proceeding. In the absence of such an order by this court, I respectfully dissent.